Good morning, Your Honors. Joshua Bachrach. I represent the appellants in this case, and I'm going to try and reserve some time for rebuttal here. We're appealing the District Court's judgment in favor of Mr. Gunn in this ERISA long-term disability case. The Court decided that it was arbitrary and capricious for my client to discontinue benefits after 24 months. Now, contrary to the District Court's decision here, the plan in this case limits benefits to 24 months for disabilities that are caused or contributed to by a mental illness. Mr. Gunn was diagnosed... That's the policy of the language of the policy. That's the policy. Correct, Your Honor. Mr. Gunn was diagnosed with severe depression. His disability began when he was admitted to the emergency room with severe anxiety. And Social Security has declared him disabled due to his mental illness symptoms. Now, as the Court's aware, he also has multiple sclerosis. We don't deny that. But he has the remitting and relapsing form. And what that form, as documented in the record, reflects is there are periods of exacerbation symptoms, and then it follows that those symptoms go into remission, either fully sometimes or partially. So the important question for my client was, at this 24-month mark, what symptoms did he have physically? Because under the policy, the mental illness had to come out. And Mr. Gunn's own neurologist, Dr. Brandes, stated that he had mild MS symptoms. Now, counsel, in her brief, argues that we pick out just one record. But that's not true. The fact of the matter is there's very little treatment for the MS in 2003 during this 24-month period, or just before it. But we see a plethora of records involving treatment for mental illness. He's being treated by Dr. Gross. What's our standard of review? It's abuse of discretion, arbitrary and capricious. No, it isn't. Yes, it is, Your Honor. That's not the standard of review where there's a structural conflict of interest in the plan. And that's where the insurance company and the plan administrator are basically one and the same. With all due respect, Your Honor, in Metropolitan Life v. Glenn, the Supreme Court of the United States said that, regardless of a conflict, the standard of review is always the arbitrary and capricious standard. But what you do is you factor in any conflict of interest. Well, you have a balancing test. You have a balancing test. Well, this Court didn't like that term a few years ago when it abated. This Court refused to have the sliding scale. It's a factor. It is a factor, and the Supreme Court has said that it is a – the conflict is a factor that is only looked at if the other factors are closely aligned. It's a tiebreaker, according to the Supreme Court of the United States. So unless the facts – Is that what the Supreme Court said? Yes. It's a tiebreaker. Yes, when the other factors are closely aligned. In those words. When the other factors are closely aligned. Is the word tiebreaker in there? I don't recall specifically. But you just said yes when I asked you that question. Well, Your Honor, the closely aligned part is clearly in there. I could go back and look at the decision and let you know about tiebreaker. My recollection is if it's not specifically stated, they're worse to that effect. But, Your Honor, let's talk about the conflict because what this Court has most recently said in Montour v. Hartford is the criticism of Hartford was because that – in that case, the defendant did not conduct an IME. In this case, my client went out and conducted an IME. They hired a neurologist to see what symptoms are attributable to multiple sclerosis. And what that doctor – what Mr. Gunn told that doctor was he had some instability with his lower extremities. The doctor said, yes, he has some mild gait instability, and for that, he could use a cane. All right. Counsel, I think, at least from my standpoint, we may be getting the cart before the horse because the district judge didn't agree that this policy was limited to physical disability. The district judge looked at a summary booklet and found that there was a conflict between the description of benefits in the summary booklet and the plan itself. Am I correct?  And I don't know – I think one of the things we're going to have to decide is whether the district judge was correct in doing that. But that's the analysis the district judge followed before the district judge ever got to the issue of what the medical evidence was. That is correct. It would help my thinking if you were to tell us whether the district judge was right or wrong on that. And I was going to get to it, but now is the perfect time, Your Honor. The judge was wrong for many reasons that you look at under Ninth Circuit law. The most important reason is the document that they relied on in the district court and the judge followed is not in the administrative record. And the law of this circuit is clear. If it's not in the administrative record, it can't be considered. Counsel for Mr. Gunn cites to a case in their brief called Benuelos v. Laborers Construction. And what that court said – I'm sorry, Construction of Laborers. It's 382F3897. And in that case, one of the parties tried to introduce this other plan document. And the court said, no, this is wrong, because even if the one in the record is in error, it's in the administrative record. There are only two exceptions in this circuit that allow a court to go beyond the administrative record, conflict of interest evidence or when it's de novo review. Neither of those exceptions was present in Benuelos. The court said, we are looking only at what's in the administrative record. And neither of those exceptions allow the court to look at this other document in this case either. And it doesn't matter whether this issue is raised by a defendant or a plaintiff. The law of the circuit is clear. It applies to both parties. If it's not in the administrative record, it can't be considered. And I'd like to point out that while this claim was still pending, my client didn't hide anything. While this claim was still pending, there was a request for plan documents to the insurer. And the insurer said, we are not the plan administrator. Go to the employer. Apparently that never happened. But my client told them where to find these documents. So that's the first reason out of many that it was wrong to rely on this other document. Second reason is it's not an ERISA plan document that can be relied on. If it's not an official plan document that meets the requirements of ERISA, it can't be relied on under the law of this circuit, PCOTA versus Teledyne Industries. Now, this so-called summary plan description appears on about 20 pages. The record excerpts 36 through 57. And it is missing virtually everything that's needed for a summary plan description. So Mr. Gunn's attorneys say, well, add to it these other documents that the employer prepared. And now you have one. But the problem is, and it's on page 1051 of the record excerpts, the employer testified, if somebody asked for the summary plan description for the long-term disability plan, they only gave those 21 pages out, not these other documents that they rely on to create the summary plan description. Are you saying there was no summary plan description available in this matter? The document they're relying on is not a summary plan description. That's not the question I asked you. Was there a summary plan description available? Did they have one? They had a document they called a summary plan description, which did not meet the requirements of ERISA summary plan description. It was missing the majority of the items that the statute requires for a summary plan description. Well, who is supposed to prepare the summary plan description? Well, the plan sponsor is. But the fact, Your Honor. Well, the plan sponsor, and that's the employer, and that's the insurer. Not the insurer, Your Honor. The insurer is not the plan administrator. They're the claims review fiduciary. The plan administrator is only the employer if nobody else is named. So my client, Reliance Standard, had no duty to prepare a summary plan description. That fell on the employer. Now, in Sinelli v. Security Pacific, this court held that even if you intend to create a summary plan description, if you don't do it right, it's not a planned document. And if it's not a planned document, it can't be relied on. Now, here are the other problems, Your Honor, with this. Counsel relies on this case called Burke v. Retirement Plan for Mark Ayer. And what counsel says is that when there are conflicts in planned documents, you always have to use the one that's more favorable to the claimant. That's not what Burke says. Burke says that when you have one planned document that unambiguously confers benefits and you have a second planned document that unambiguously does not grant benefits, in those situations, you follow the one more favorable to the participant. We don't have those facts here. Because even if that document's in the administrative record, it's not. Even if it is a planned document, which it's not, the policy clearly and unambiguously says, after 24 months, no benefits for mental illness. The other document they rely on also says, after 24 months, no benefits for mental illness. But it does it in a way that's not as clear and is, therefore, ambiguous. And there's a case, fairly recent case, out of this court, and I didn't cite it in my briefs because I just found it, it's Weiss v. Northern California Retail Clerks, 222 Federal Appendix 555. And what that case says is that if you have an unambiguous document, you can't then rely on an ambiguous one. That's not an opinion. You're right. It is a decision. It is an unpublished decision. It's a memorandum, unpublished decision, which is not considered precedent. I understand that, Your Honor. But you didn't tell that to us, did you? Well, Your Honor, I apologize if it is no different than the Leeson decision that they sent to Your Honors a few weeks ago. It is, I'm not saying you have to follow it. I'm saying it's very persuasive authority. And it does so in the correct way. Counsel, this disability booklet also contains a disclaimer, doesn't it? It does, Your Honor. And the disclaimer says that this booklet's just in general terms and that it's the plan document that would determine the legal rights. And if there's any inconsistency between those documents, then the plan document will govern. And the plan document clearly says there's no benefits for a disability that's caused or contributed to by mental illness, doesn't it? That's correct, Your Honor. And in PCO, the same case I referenced earlier, the court enforced these disclaimers. And I think it's interesting, counsel, in their brief said, well, some other subsequent cases have said that, no, but those Counsel, did the plan administrator even have any opportunity to decide what the effect of this handbook was, this booklet? I mean, if it wasn't in the record, was there any argument made to the plan administrator when they were deciding whether this person was entitled to benefits, that, well, maybe there's a more liberal standard that ought to be applied because of the booklet? Well, Reliance Standard had no way of knowing what Payne Weber had prepared. But my client, Reliance Standard, well, they're both my clients. The plan is also my client. But Reliance Standard specifically told counsel during the claim, before the record was closed, if you're interested in the plan documents, go to the employer. And I can't, maybe counsel can explain why that never happened, but it didn't. So they didn't go get the booklet and present it? They waited until the litigation, and it was too late at that point. Clearly, under Ninth Circuit law, under Benuelos, it's too late. If it's not in the record, it can't be considered. And I'm going to reserve the remainder of my time, if Your Honors don't mind. All right. Good morning, Your Honor. May it please the Court. My name is Corrine Chandler, and I represent the appellee, Igor Gunn. I'd first like to turn my attention to the question of whether the UBS SPD is, in fact, a summary plan description. Now, appellant has stated that when an employee asks for the summary plan description, they will be given a 21-page booklet. That's not entirely correct. After the remand proceedings in this case, we took the deposition of a 3B6 witness from UBS regarding the distribution preparation of the summary plan description. That individual testified that the booklets summarizing all the UBS plans, the medical, the pension, the life, the long-term disability, are put together in an accordion envelope together with the legal and administrative overview booklet, which contains all of the statutory requirements of a summary plan description. And that legal and administrative overview booklet incorporates by reference and says that it is part of the summary plan description for each of those plans. That accordion envelope is distributed to every employee. Now, the deposition testimony is a little bit unclear, but I think that perhaps what was intended was that if an employee subsequently asks for a summary plan description after they've been given this accordion booklet or accordion pamphlet with all of the plans, then they will be given the LTD booklet. There's other evidence that this is a summary plan description. UBS testified that this was the summary plan description. UBS, when it gave the accordion packet to its employees, told its employees, this is your summary plan description. Now, appellant relies upon Pisciata v. Teledyne. However, that case is different because there was no other plan document that satisfied the statutory requirements of the summary plan description. Well, counsel, even if we agree that this booklet was a supplementary plan document, that doesn't vitiate the language of the disclaimer, does it? The disclaimer — Because even if it is a supplementary plan document, it does say if there's any inconsistency between this and the plan document, then the plan document will govern. Okay. Isn't that entitled to be enforced? Well, I would say that, well, first of all, we did cite the Leeson case. I know it is not precedential, but the Burke case and the Banulos case. I mean, in Pisciata, isn't that exactly what the Ninth Circuit said, that a disclaimer like that would preclude reliance on some supplemental plan document? I have two responses to that. First of all, the Pisciata case was before the rule of law cited in Burke and Banulos. And the law in this circuit is that the more favorable of the plan document will govern. If there's an inconsistency, will govern the claim. And the second thing — Do you think Burke overruled Pisciata? No, Your Honor. I don't think that it was an issue, because in Pisciata, there was no other plan document. So the disclaimer didn't really come into effect. The other document that the plaintiff was advancing as a plan document in that case, that would have been the inconsistent one. It was an informational booklet. It was, but it was not a summary plan description. And this is a summary plan description. It is not a supplemental plan document. It is a plan document. And plan documents are to govern a claim, whether they are included in a record or not. And that is another point that I'd like to make. They have made an issue out of the fact that the summary plan description was not in the stack of paper that they compiled and put together and called the administrative record. The administrative record, the abating court has stated, the administrative record depends upon the issues to be decided, who is deciding them. There are a number of different factors which can go into the ration or into what is finally determined to be the administrative record. Because we did — we asked for the summary plan description from Reliance Standard during the appeal. They said — It was the employer who distributed them, wasn't it? That's correct. That's correct. But I would have hoped that the — So why wouldn't you ask the employer for it like they suggested? The appeal was made to Reliance Standard. And the — it wouldn't — I frankly don't recall if they directed us to the employer or not. But we were trying to get the claim file and the administrative record to date from Reliance Standard. The — So Reliance never had the opportunity to make a decision as to the effect of this supplemental document. Well, the deposition testimony — we also took the PMK deposition of Reliance Standard regarding these plan documents. And according to the deposition testimony of their designated deponent, Mr. Walsh, he testified it would not have made a difference. He says that Reliance Standard does not administer the — it only administers the claim on the basis of the policy. They do not know if an employer has sent out a different plan document to employees. And he said it does not make a difference because we always administer the claim on the basis of our policy. I'd also like to address whether the trial court's conflict analysis was correct. In its brief and in oral argument here, RSL has suggested that conflict is not a factor unless it is a tiebreaker. That is not correct. Conflict must always be weighed by a trial court when there is a structurally conflicted fiduciary, such as Reliance Standard here. And that is the rule of law in this circuit, several decisions, Saffron v. Wells Fargo, Silver v. Unum, Panabaker v. Liberty, and the recent Montour case. RSL has also stated that it was under no obligation to tell Mr. Gunn that it was concerning the application of the mental nervous condition limitation when it was investigating that issue. This is also not true. An administrator must engage in a meaningful dialogue with the participant. In two very strongly worded opinions, Boutin v. Lockheed and Saffron v. Wells Fargo, it was made crystal clear that if an administrator thinks that there is information out there that will aid it in investigating its claim, it must ask for it. That's not what happened here. What happened here is that in February and March of 2003, RSL was looking at this claim, and at that point it was approaching the two-year anniversary of the claim. Two limitations or two policy provisions or plan provisions could be applied to limit the claim at two years. One was whether Mr. Gunn was totally disabled under the any occupation phase of the plan, and two, whether the mental nervous limitation could be applied. Now, a vocational investigation was conducted by RSL in 2001, and the results of that report were that Mr. Gunn could probably only engage in home-based, self-proprietorship type of activities. So he was obviously going to still be eligible for benefits under the any occupation criteria. In February and March 2003, RSL looked at this claim, and it stated, need to determine the primary diagnosis. Is it MS or depression? Plan. Let's send him a test change letter, which is, we are investigating whether you are disabled under the any occupation criteria. Let's see what positions he identifies as his treating positions. So even though it was investigating the mental nervous limitation, it sent him a different letter. So Mr. Gunn responds. He identifies his positions, and then they send him to an IME. Now, in its brief, RSL has argued, well, this didn't harm Mr. Gunn, but that's not the issue. The issue is whether RSL conducted a biased claims investigation, and when it is not being truthful with its insured, it is indicative of bias. And second of all, Mr. Gunn was harmed by this, and the district court found that he was harmed, and the harm can be demonstrated on page 9 of appellant's reply brief. Mr. Gunn's benefits were terminated in September 2003. He appealed. With his appeal, he submitted medical evidence, which included progress notes from Dr. Diskin. On page 9 of its reply brief, RSL criticizes that report because it was prepared after the termination of benefits. Well, that puts Mr. Gunn between a hard place and a rock. He does not know that the mental nervous limitation is going to be applied to his claim until it is terminated. During the appeal, he submits evidence in support of his claim, and then it is dismissed because it was prepared after the termination. The second factor in which the court reviews benefits. Counsel, I'm sorry. I've been looking for the letter. I can't find it. Which letter? The letter that they sent telling him they're going to review his disability determination. And I know I have it, but I'd like for you to help me with the precise language of that letter. I think it referred to his medical condition, didn't it? I think it is at essence of record 295. Didn't it say they were going to review his disability in light of his medical condition? Maybe. They advised him. And excerpts of record 295. It says, as of this date, after the two years, the group policy requires that you be disabled from performing the material duties of any occupation given your medical condition and vocational background. We are reviewing your claim because of the change in the definition of disability. There's no mention of application of the mental nervous limitation in that letter, even though that is what they are investigating. And? Well, weren't they investigating whether his medical condition rendered him totally disabled? They, at record, excerpts of record 346. You want to bring it up there so that, because what you're saying is recorded. I'm sorry. I'm sorry, Your Honor. Yeah. The excerpts of record at 346 is the claim note that indicates what they were investigating. Okay, I know the claim note is one thing, but you're complaining they didn't tell him enough. But I think the letter told him specifically they were reviewing his medical condition. Yes, but what they were actually... As it relates to his disability. What they were actually looking at, though, is whether, what was the primary diagnosis? They were looking to see whether the mental nervous condition limitation applied to his claim, not whether he was totally disabled under any occupation. Well, they were trying to determine whether he was totally disabled because of his medical condition as opposed to his mental condition, correct? I believe that there is a distinction, that under the any occupation criteria in the plan, the disability, the nature of the disability or the eligibility for disability changes because of the vocational aspects. You might be disabled from one part from your job, but you're not disabled from any job that you are suited by education or training or experience. The mental nervous limitation applies even though you might be disabled for all jobs, but because your disability is a mental nervous condition, such as depression. So he was... And RSL asked its own physicians. The point blank to Dr. Hoffman and Dr. Orpus, is the disabling condition psychiatric or is it due to his MS? That was never asked except for... That was never asked of any of Mr. Gunn's physicians, which leads me into... Before you get led into the next one, Ms. Chandler. Yes. Let me just ask you here. It seems to me that you are relying on the language of the SPD to say that the only reason he would be denied continuing benefits after 24 months would be if his inability to work was caused solely by mental illness or difficulty. That the mental nervous limitation contained in the SPD has been construed by this court as being ambiguous. It applies to disabilities that are mixed in nature. We have also argued in the trial court that he is independently disabled because of MS. Okay, fine. Now, the SPD contains a disclaimer that says that anything in here, in this summary description, conflicts with other provisions of the plan, then disregard this language of the SPD, something to that effect. And there is an insurance policy, which is the plan document, that says so long as the inability to work is caused by or contributed to mental illness, you can't go beyond 24 months. That seems to be pretty clear. The insurance policy, the mental nervous limitation contained in this insurance policy has caused or contributed by language. Yes. Which would suggest that it has to be solely, that one has to be independently physically disabled. Okay, that would be a question that we'd have to... Which we have contended that he is. Okay. But suppose it's as I suggest, that the language you say, well, it's pretty clear that means it's got to be solely because of mental, or rather, as long as mental illness contributed to it, it's a factor, then it's going to end at 24 months. Suppose we came to that conclusion. Then I think you would argue, well, the investigation was an unfair investigation and due to the basic limitation or the additional factor we have to take into when there's a conflict. Correct. That would tip the scale and we would say, well, even though you could conclude and it would be very close you could conclude, because here the investigation and determination was not fair. Correct. Given the conflict standard, coverage would continue. Is that your argument? That's correct. Under the Tempered Abuse of Discretion Review, because of the conflict of RSL and because of its biased claims investigation, one of the points that I haven't addressed, that I did address and the trial court adopted, was also the selection of Dr. Hoffman as the medical reviewer. That also caused her to further reduce her deference. Yes. And that's pretty clear. You made that argument in your brief very strongly. I have run out of time. Do you have any questions? I interrupted her before she got there. Okay. I would like to address the argument concerning Dr. Hoffman as a selection of a biased medical reviewer. In this circuit, both in the Nolan v. Heald College and the Montour v. Hartford case, it was stated that the frequent retention of the same medical reviewer by an insurer could be evidence of conflict. This is not a novel concept. The Supreme Court, in Nord v. Black & Decker, in reviewing this Court's adoption of the treating physician rule, stated, Nor do we question the Court of Appeals, that was this Court, concerned that physicians repeatedly retained by a benefit plan may have an incentive to make a finding of not disabled in order to save their employers money and to preserve their own consulting arrangements. Now, Dr. Hoffman was one of those doctors. He derived one-third of his income from RSL. He made well over six figures from RSL in 2002, 2003, and 2004. And that alone is not what I am basing my argument on. What I'm basing my argument on is that RSL knew he had been criticized. He had been criticized by other courts. They had the opportunity to suggest that he change the manner in which he conducted review. They did not do that. And the trial court relied upon RSL's knowledge of Dr. Hoffman as a biased medical reviewer to reduce her deference, which dovetails into a recent argument made or advanced by the Montour Court, and that is that insurers should come forward, if they want the full deference, they should come forward with affirmative evidence of their neutrality. And here RSL had an opportunity to correct the manner in which Dr. Hoffman conducted its reviews, and it didn't. And I note that RSL has cited several cases where Dr. Hoffman's findings were adopted by a court or approved. I think there were seven cases cited in their brief. I note that six of them were after this claim. So perhaps Dr. Hoffman has been given that chance now. Lastly, I want to address an argument that didn't really come up, but I anticipate might come up, and that is RSL has relied in this litigation, not in the denial letter and not in the termination letter, upon a note contained in Dr. Gross's medical records. The note says, Neurologist advised that disability is psychological, and that note was in 2003. Later on, someone inserted, and I'm not saying it's RSL, but maybe a nurse, inserted Andy Mann, which is Dr. Andy Mann, which is Mr. Gunn's neurologist. Now, and RSL has contended that since that is evidence that even Mr. Gunn's treaters thought that his claim was psychological. But that is not what happened. If we had been notified of that basis for application of the limitation, we could have submitted rebuttal evidence on appeal. So this argument has not been raised until this litigation. When it was raised in the litigation, we attempted to submit a declaration from Dr. Andy Mann that stated he was never of that opinion. The district court did not admit the declaration, and that would have been the proper procedure under Saffron v. Wells Fargo or Abatey. When a new reason is advanced, the plaintiff must be given an opportunity to submit rebuttal evidence. District court didn't admit the declaration because she was of the belief that the altered note in the medical records was of little probative value. And I would say I noticed this in preparing for this appeal that it is of little probative value because even Dr. Hoffman in his medical review attributes that statement to Dr. Orfis, RSL's own medical examiner and not Dr. Andy Mann. And that is at excerpts of Record 780. The court has been very generous with the time. Thank you very much. We ask that the decision be affirmed. Let me ask you this. Is it your position and is that position substantiated by the evidence that the MS standing alone is sufficient to rule that your client is totally disabled? Due to MS, absolutely. MS or you take everything else away. And of course, I mean, does the record show that depression is part of MS? Yes, Your Honor. The record shows there is literature in the record that we submitted on appeal that shows that depression is one of the side effects of MS. But we are not relying on just depression. What we are relying upon are the physical symptoms that he experienced from MS. And you might take a note, one word out of an attending physician statement where an attending physician also said depression, but they also listed all of the other physical symptoms that he was experiencing from 2001 to 2003. During the course of this claim, twice an RSL nurse looked at this file and said, we cannot separate the two diagnoses. The claim was originally approved on physical grounds. The evidence supporting the physical nature of his disability is summarized or is quoted on pages 59 and 60 of my brief. But I can tell you that in 2003, he had, the doctor notes documented exhaustion, vasomotor instability, weakness, and parasitiasis. That's by Dr. Gross. Dr. Brandes in 2003, he had a toxic gait, falls immediately with the Romberg test, severe fatigue, severe cognitive problems. That's at exerts of record 856. In October 2003, again with Dr. Brandes, fatigue, lightheaded spouse, loss of balance, right-sided weakness. RSL says that Dr. Cho did not note any MS-related problems in her records for the period of time up to June of 2003. That is not true. She noted upper extremity paralysis and weakness, taking a shower. From 2002 to 2003, she summarized fainting spells, fatigue, joint pain, and at one point in 2002 said MS fatigue predominant. Now, this claim was approved on a physical basis for two years. And with all of that evidence, they retroactively classified it as a mental nervous disorder. Why do you say it was approved originally only based upon a physical condition when under the policy, either mental or physical would suffice? I don't know why RSL had to make that determination, but their claim note does say that it was approved under the regular slash physical portion of the policy. I can, if Your Honor wants. Sure. Go ahead and get it. At excerpts of record 354, it is stated, will approve under regular portion of LTD policy, parent, physical. And that was in November 2001. In October of 2001, RSL nurse said, currently unable to separate diagnosis. He has less than sedentary work capability. Excerpts of record 600. Unable to separate the mental from the physical? Yes. Are there any further questions? Well, what is your understanding of the standard of review? The standard of review utilized by the trial court or by this court? The standard of review by this court. By this court. I believe that the court reviews the trial court's findings of fact for abuse of discretion, and it reviews the choice and application of the standard of review de novo. Say the last part again. I believe that it reviews the standard of review employed by the trial court de novo. Did the trial court apply the correct standard? That's a de novo review. That's correct. And then we say, okay, the standard should be abuse of discretion. If the trial court applied that, then we would say, well, did he abuse his discretion in the decision he made? That's correct. Did she do that? Yes. And no, she didn't. She did what? She abused her discretion. She reached the right result. She followed what Abbate required? Yes. This case was originally tried under the old burden-shifting test, the Atwood test. We prevailed in that case in this case, and RSL appealed it. And just shortly after everything was briefed, or maybe during the briefing, I don't recall, Abbate came out, and the case was remanded back to the trial court. There was no oral argument, and there was no decision on the appeal. It was just an automatic remand back to the trial court. The trial court then applied Abbate and rendered the same decision or rendered a decision in plaintiff's favor again. Was that the Ninth Circuit's in-bank decision in Abbate? Yes. Or the Supreme Court's? It was the Ninth Circuit's in-bank decision in Abbate. While this case was pending back in the trial court the second time, it became clear that Glenn v. Metlife would be issued shortly from the Supreme Court, and rather go through this bouncing back and forth again, the parties stipulated to stay the case, and Judge Cooper approved the stipulation to stay the case until the Glenn decision could come out. So the case was briefed with the benefit of Abbate and Glenn. And, okay. All right, thank you very much. Thank you. Oh, and who was the final judge that dissented in the three-judge panel on Abbate? I believe that would be you, Your Honor. Well, thanks for reminding me. Your Honor, a few quick points. First and foremost, my memory served me well today, for once. In Glenn, the Supreme Court said a conflict of interest is just one factor. Did that serve you well? My memory served me well. Oh, well, congratulations. Thank you. The Supreme Court in Glenn said that a conflict of interest is just one factor, which will act as a tiebreaker when the other factors are closely balanced. So the word tiebreaker is specifically in there. Now, I heard counsel saying that the district court judge did not abuse her discretion, but she didn't have the discretion. My client has the discretion under the law. And what this court's review is de novo following the same standard that should have applied in the district court. So that means did my client abuse his discretion? That's the standard. Regarding the claim note that counsel relies on, well, it specifically mentions depression. And it talks about depression and cognitive issues. And so there was no reason for my client to say it's depression or it's physical, because benefits were payable either way for 24 months. So I don't know what counsel is trying to get out of that point. Counsel mentioned also the trying to say that the employer held the whole thing out as an SPD. That's wrong. Pages 1050 to 1051 of the record excerpts. Do you consider this whole group that has been produced collectively to be a single SPD, or do you consider the separate book list to be individual SPDs? I would consider them to be individual SPDs. And from there, she went on to testify that the one document that discusses LTD benefits is that separate SPD. Now, she's saying that my client somehow misled her attorneys, who, by the way, counsel here and her firm are some of the better, if not the best, ERISA attorneys in this state. My client couldn't do anything to mislead them. They were representing Mr. Gunn at the time. But more important, how is it misleading if my client asked him to identify on a questionnaire all of his treating doctors, not just the psychiatrist, everything that prevented him from working, not just what mental problems do you have? And counsel harps on this, Dr. Hauptman, but what about the fact that as in Montour, this court said in Montour, an IME is important. It shows a lack of bias. My client got an IME, and it fully supports the decision in this case. And in Montour, the court also said that you have to reconcile the Social Security claim. My client did that, too. Social Security is based entirely on the mental illness. Counsel, did I hear your opposing counsel state that Dr. Hauptman received one-third of his income from your client? I don't recall. Is there any evidence of that in the record? Well, he was deposed, and he talked about his various things. He was the medical director at one point for Reliance Standard. So he reviewed all claims, and if counsel wanted us to get into, well, how many did you approve? I mean, the reason you don't hear about claims that he approved is because there's no litigation. But he reviewed almost every claim for Reliance Standard that came in the door, and the overwhelming majority were approved. Well, let me ask you this. We have the Ninth Circuit decision. Well, we have some decisions that involve Dr. Hauptman, and one of them, Conrad v. Reliance Standard Life Insurance Company, let's say a case out of the District of Massachusetts, the judge is quoted as saying Dr. Hauptman, quote, betrayed a palpable bias in favor of rejecting the claim. In another case, a district court in the Eastern District of Pennsylvania, in a decision, stated the conclusions reached by Dr. Hauptman carry some level of bias. And I believe there are other cases along those lines out there. Well, let's throw them out. Let's look at the IME report. She doesn't criticize the IME doctor, Dr. Orfus, who conducted a full independent medical examination, and that's what this court wants. Who selected Dr. Hauptman? Who selected? Well, Reliance Standard did. Okay, so we weren't born yesterday. Or as one said, we didn't fall off, just fall off the turnip wagon. We know what goes on. People are selected because they're expected to produce favorable reports. Your Honor, I strangely disagree. I've been around a long time, and I'm telling you that's my reaction. If you can disagree, that's fine. Generally, that's the case. Your Honor, there may be some. I can tell you that once all this came out, by the way, Conrad came out in late 2003, I believe. His review, Dr. Hauptman's review was around that time. So how could Reliance Standard react when it didn't even know about the decision at that point? But more important, as a result of that, they have said, look, we still think he's a reputable doctor, but we'll use other doctors, so they're doing that. So now we have an IME, though. I'm not saying he's not a reputable doctor. What I'm saying is that when you keep using an expert over and over and over again, there's a tendency that they may wish to produce a report that's favorable to the person that calls upon their services. Well, certainly they're paying him, Your Honor, and I can understand. And there are probably some companies that abuse this. I'm sure it's happened. I wish it wouldn't. But I can also tell you, tell Your Honor, that in Montour, the court said, we like IMEs and we have an IME, and it fully supports the denial in this case, and it took place right at that 24-month mark. And if I could just a couple other points, Your Honor, and I'll make it very quick. I'm glad you like me on that. Go ahead. Your Honor, counsel had no response to the fact that this document's not in the administrative record. The law is clear in the Ninth Circuit. It can't be considered. Counsel says that the disclaimer was not an issue in Burt. Well, it was an issue because there was no disclaimer in Burt. So that line of cases clearly doesn't apply. And then counsel says, don't rely on the Pisciotta case because that other document wasn't a planned document. That's a misreading of that decision. The court said, even if it could be considered a planned document, based on the disclaimer, it can't be relied on by the claimant. So it's a little inaccurate to say Pisciotta doesn't apply. Finally, counsel's referring mostly, again, to the records back in 2001 and 2002. In 2003, her own doctor says mild MS. Her own doctor says severe depression. And this policy specifically says if you have depression, you're limited to 24 months. I don't think under these facts, not applying the policy, which is the only planned document in the record, this decision comes anywhere close to being an arbitrary and capricious one, nor does it need a tiebreaker. We're asking that the judgment be reversed. Thank you, Your Honor. Thank you very much. And this matter will stand submitted, and the court will adjourn until 9 a.m. tomorrow morning. All rise. The court stands at recess until tomorrow morning at 9 a.m.
judges: Graham, Pregerson, Thompson